UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| CELENA NIXON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:25-cv-213-PB-TSM |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

UNITED STATES' REPLY TO PLAINTIFF'S RESPONSE
TO MOTION FOR SUMMARY JUDGMENT

Plaintiff's Response (ECF No. 36) to the United States' Motion for Summary Judgment (ECF No. 31) fails to raise disputed issues of material fact or refute the legal arguments raised, and therefore, the United States is entitled to judgment as a matter of law under Fed. R. Civ. P. 56, as argued in its Motion.

I.  Revisiting the Facts.

Plaintiff's description of the facts in evidence is, on occasion, erroneous or misleading. Before the fall at issue here, Pease did not have a formal policy about who could use the fire pole.[1]  Resp. at 3.  Although Deputy Chief Verespe testified that he, personally, "would never allow anybody or any –anyone to use" the pole, Verespe Dep. 33:14-16 (ECF 35-21 at 6), he also testified that before he wrote a memo on the issue after Plaintiff's accident, there was no policy about use of the pole by non-employees.  *Id.* 53:5-9 (ECF 35-21 at 12).

Although tours of the station were relatively common, there was no testimony that "children as young as 10 years older were allowed to use the fire pole at Pease." Resp. at 4.

---

[1] According to Joshua Nixon, "for months and months" while he was at Pease, it had no written policies of any kind.  J. Nixon Dep. 20:12-21:15, attached as Ex. A.

1

Rather, Captain Nicholas Smallwood testified that through the Make a Wish Foundation, one ten-year-old girl who was "on an escort from two EMTs . . . the entire time she was there because she was not well" and was "very weak" was "assisted [by the fire fighters] down a fire pole." Smallwood Dep. 27:20-28:20 (ECF No. 35-22 at 6-7).  This does not establish that "children" used the fire pole.  Although Joshua Nixon testified that he saw Chief Deputy Verespe's daughter use the fire pole, Resp. at 4 (ECF No. 36), the Deputy Chief denied that this happened, and there is no allegation that other Verespe family members used the fire pole.  Verespe Dep. 33:12-14 (ECF No. 35-21 at 6).

Testimony about prior injuries associated with the fire pole included an ankle injury and "bumps, bruises, and pulled hair," but not from falling down the fire pole, to the deponent's knowledge.  Smallwood Dep. 34:23-35:1 (ECF No. 35-22 at 13-14); 34:2-3 (*Id.* at 13) ("I had actually never witnessed somebody fall down the pole.").  Further, these injuries were alleged to have occurred before the deponent had come to work at Pease, and before Pease came under federal leadership.  *Id.* at 84:11-12 (ECF No. 35-22 at 28); 84:13-85:3 ("[I]t was back when we were state employees.") (attached as Ex. B).  The testimony at issue did not include that federal *management* was aware of the injuries.  *See* Verespe Decl., Ex. 1 to Mot. for Summ. J. at 4 (ECF No. 31-2) (stating that he has been unable to find any evidence of injuries incurred by using the fire pole).

Plaintiff's suggestion that "[a]ccording to testimony, the trap door may not have been functioning or was disabled" is also not supported by the record.  *See* Verespe Decl. at 4 (ECF 31-2) (no evidence of malfunction during the time Verespe has worked at Pease).  Captain Smallwood's testimony that the mechanism at the bottom of the fire pole shaft "was supposed to

2

catch you" is based on "what [he] was told when [he] first got appeesed[2] [sic], when [they] were state." Smallwood Dep. 34:4-12 (ECF 25-33 at 13). Moreover, he "had never actually witnessed somebody fall down the pole," so couldn't "attest to their strength." *Id.* 34:2-3 (*Id.*)

Nor does the record support Plaintiff's contention that firefighters referred to the exhaust cover as a "trap door" *because* its "dangers" were "concealed." Resp. at 22 (ECF No. 36). Rather, Captain Smallwood simply used the label trap door to describe the mechanism, without providing any explanation why he used that term.[3] Smallwood Dep. 31:9-12 (Ex. A at 1).

II.  Plaintiff fails to refute the United States' Discretionary Function Defense.

Plaintiff's claim that the Discretionary Function Exception does not apply here because the United States failed to secure the premises and ran afoul of mandatory rules fails on the undisputed facts. Nothing in the record supports her contention that the exhaust cover in the fire pole shaft was a "Floor Opening Cover" and therefore had to comply with mandatory requirements for such a cover. *See* P.'s Resp. at 12-13. Plaintiff's safety expert, Chief Johnson, cites Air Force Manual 91-203 as requiring that "every floor opening shall be *guarded*" and that "*any cover used*" must be capable of supporting twice the maximum intended load. Johnson Expert Mat'ls at NTL-2247 (ECF No. 35-16 at 9). The plain language of this provision does not mandate that a floor opening be *covered*, only that it be *guarded*. The requirement that "any cover used" must meet certain weight requirements allows for the possibility that a cover would not be used, if the opening was otherwise guarded. And the fire pole at Pease was otherwise guarded – by the substantial, solid metal gates, fence, and railing. Mot. for Summ. J. at 4-6 (ECF

---

[2] This is likely a transcription error for "at Pease" or similar.
[3] Further, Merriam-Webster defines "trap door" simply as "a lifting or sliding door covering an opening (as in a roof, ceiling, or floor)," with no reference to the opening being hidden or a surprise. https://www.merriam-webster.com/dictionary/trapdoor (last viewed Dec. 5, 2025).

3

No. 31-1). It was not covered, because the railings met the requirement that it be guarded. *Id.* at 6. Moreover, the exhaust cover was not intended to cover the opening in the second floor, because it was set 40" below the level of that opening, and thus patently not intended to serve the purpose of a cover, which was to prevent people or items from falling into the fire pole shaft. *Id.* at 4-6. Thus, the exhaust cover did not fall under Manual 91-203's weight requirements.

Plaintiff's attempt to turn the exhaust cover into a floor opening cover by arguing that it was intended to prevent falls to the first floor below also overlooks the fact that a mechanism placed at the bottom of the 40" shaft would not, and could not, prevent accidental falls into the shaft itself. And OSHA's commentary that "the fire pole opening in fire stations would fall under the definition of floor opening" does not require fire stations to use a floor opening cover, where the opening was otherwise guarded.

Similarly, OSHA's requirement that a cover for a hole in a walking-working surface "support[], without failure, at least twice the maximum intended load that may be imposed on the cover at any one time" and "[i]s secured to prevent accidental displacement" does not mandate that a cover be used; it mandates only the requirements for a floor opening cover, where one is used. *See* P.'s Resp. at 13 (ECF No. 36); NTL-2247 (ECF No. 35-16 at 9). Thus, Plaintiff is wrong that whether the exhaust cover was a floor opening cover is "a fact question," because the relevant facts are undisputed, and its nature is clear as a matter of law.

Plaintiff's claim that the fire pole at Pease "had no means to prevent accidental falls" likewise fails, because the substantial metal railings, gates, and fence around the pole served that purpose. *See* Mot. for Summ. J. at 4-6 (ECF No. 31-1), Kelly Rep., Attach. A to Ex. 3 (ECF No. 31-9). Testimony that the pin lock was commonly not engaged is immaterial to whether the railings would prevent an accidental fall into the shaft, because the spring-loaded gates open

4

outward; locked or unlocked, they would not open into the shaft in response to the weight of someone falling onto them from the fire pole room. Arguably, if someone who was already inside the railing fell onto the gates in the direction of the fire pole room, whether the pin lock was engaged might be material to whether the gates would open. But that is not the kind of accidental fall that the gates are intended to prevent, or which is at issue here.

Further, Plaintiff's claim that "at time the gates were left open – including the day of the fall" simply fails on the record. Resp. at 14 (ECF No. 36). First, even if the gates could be left open, Plaintiff's assertion that the gates were "left open" on "the day of the fall" is simply conjecture. Captain Smallwood testified that the only time the gates might be propped open would be "only for cleaning," when some new fire fighters would hook up climbing equipment to go down the pole slowly and polish it as they went, "[s]o in those cases, was it cropped [sic] open, I don't – maybe, maybe not. I can't think of it, but that would be the only time that I would think of." Smallwood Dep. 52:7-22 (ECF No. 31-7 at 13). He also subsequently testified that although he was unaware of it happening, "it wouldn't surprise" him if the pole had been cleaned on the day of the fall. *Id.* 53:22-54:4. But these hypotheticals are not evidence that that the gates "were left open" on the day of Plaintiff's fall. In fact, Captain Smallwood also testified that he "[couldn't] think of a single time nor did [he] ever see a single time" when the gates were propped open and the fire pole was left unattended. *Id.* 96:23-97:12, attached as Exhibit B; *see also* Verespe Decl. at 3 (ECF No. 31-2).

The undisputed facts in the record also demonstrate that it was not possible to leave the gates open without propping them open with something heavy or tying them to the railings. *See* Mot. for Summ. J. at 27; *see also* Verespe Decl. at 3 (ECF No. 31-2); Smallwood Dep. 52:25-53:1 (ECF No. 31-14 at 9-10) ("Q. Have you ever seen the gate left open before? A. I can't.

It's got spring loaded . . . so it would open, and then spring shut."). Testimony by the Nixons that the gates were somehow left open, but not propped or tied, cannot override the physical reality of the gates. *See* Mot. for Summ. J. at 27 (ECF No. 31-1).

Plaintiff's argument on the law is no more successful. Her attempt to distinguish *Ayer v. United States*, 902 F.2d 1038, 1039 (1st Cir. 1990) because this case involves "an Easter party and fire station tour," not "managing a nuclear-weapon-proof missile launch control room," Resp. 16 (ECF No. 36) misapplies the discretionary function exception analysis. The policy interest in *Ayer* was, in fact, managing a nuclear-weapon-proof missile launch control room, but the policy interest here is not hosting an Easter party or giving tours; it is managing firefighter access to a tool that helps them to respond within the extremely short time allowed to respond to a fire. Given that the base houses the 157th Air Refueling Wing, which supports both state and federal military missions by providing aircraft refueling services, a fire on base poses a serious threat both to the personnel involved and to state and federal interests. *See* 157th Air Refueling Wing, "About Us," https://www.157arw.ang.af.mil/About-Us/ (last viewed Dec. 5, 2025).

While these interests may not reach the national security concerns involved in managing a nuclear missile control room, neither are they comparable to the "mundane, administrative, garden-variety housekeeping problem" in *Gotha v. United States*, 115 F.3d 176, 181 (3d Cir. 1997), on which Plaintiff relies. At issue in *Gotha* was whether the Navy should have installed lighting and stairs on an unpaved path linking upper and lower portions of a facility. *Id.* at 178. The Third Circuit rejected the government's discretionary function exception defense where there was no evidence that the path played a role in the facility's military function, and the policy interests proffered were primarily generic concerns about budgets, procurement requirements, and the service life of the facility that "sweep so broadly" and were "of such general application

as to provide no assistance in determining whether the discretionary function exception fits the situation here." *Id.*

*Stone v. Howe* is no more helpful to Plaintiff. First, it construes Vermont law, which does not apply here. *See* 28 U.S.C. § 2674 (the United States is liable in the same manner and to the same extent as a private individual under like circumstances"). Second, it involves the doctrine of assumption of risk in the master-servant context, which New Hampshire law no longer recognizes. *Bazazi v. Michaud*, 856 F. Supp. 33, 34–35 (D.N.H. 1994) ("In New Hampshire, the defense of assumption of the risk has been supplanted by the doctrine of comparative fault set forth at New Hampshire Revised Statutes Annotated (RSA) 507:7–d."); *England v. Tasker*, 129 N.H. 467, 470 (1987) ("The assumption of the risk doctrine . . . has little vitality today in light of the trend towards comparative negligence."). Finally, *Stone*'s facts are inapposite where the plaintiff there literally could not see the chute through which he fell, which was physically covered by at least 4 feet of hay; being unable even to see a hazard is a different circumstance from seeing a hazard and choosing to engage with it. Plaintiff here did not need a "knowledge of firefighting equipment equal to that of professional firefighters" to understand that a fire pole offers a way to travel between two floors and therefore necessarily poses a risk of falling through the hole. As shown by Deputy Chief Verespe's comparison of the fire pole with an axe – a self-evidently dangerous tool – the fact that professional firefighters use an item does not mean that only those professionals can appreciate its risks. *See* Resp. at 23.

Finally, Plaintiff claims that the United States' policy interest in "speed of fire response . . . does not explain how keeping an untrained visitor from using the fire pole impacts fire fighter speed." Resp. at 15 (ECF No. 36). This policy interest, however, bears directly on multiple

claims made in the Amended Complaint. Plaintiff alleged that the United States was negligent by:

> failing to restrict access to the pole and the pole room to individuals not trained to use the pole; . . .
>
> failing to secure the floor around the pole such that it did not immediately allow individuals to fall through or alternatively, not having a hatch in the first place so laypersons would see that the floor could not support any weight; and
>
> failing to install barriers to prevent lay persons from approaching the pole or the floor immediately surrounding the pole.[4]

¶¶ 9.1, 10.3. Restricting access to the pole and pole room to untrained individuals might implicate speed of response, depending on the means of access; for instance, Plaintiff argues that the fact that the "fire pole room was always unlocked" showed that the United States failed to implement appropriate hazard controls," Resp. at 5 (ECF 36), but keeping the room locked would hinder access for firefighters responding to a call. "[S]ecur[ing] the floor around the pole so it did not immediately allow individuals to fall through" likewise would reduce firefighter response times, where the whole point of using a pole was to allow fast access to the floor below. "Not having a hatch in the first place" would be unlikely to bear on response speed, but implicates another policy interest, in maintaining fire fighter health by protecting them from fumes rising from the engines and other equipment stored directly below. As for "install[ing] barriers to prevent lay persons from approaching the pole or the floor immediately surrounding the pole," the United States did exactly that, by surrounding the fire pole with a solid metal fence, railings, and gates. To the extent Plaintiff believes even more substantial barriers were

---

[4] Plaintiff has withdrawn her allegation that the United States was negligent by "installing a pole in the fire station or, alternatively, failing to remove the pole before April 17, 2022." Resp. at 36 (ECF No. 36).

required, any barrier that would effectively prevent lay persons from approaching the pole would likewise hinder fire fighters responding to a call.

    III.    <u>The United States did not admit fault and is not vicariously liable.</u>

Finally, Plaintiff places too much weight on statements she construes as admitting fault. *See* Resp. at 28-29 (ECF No. 36). Neither Deputy Chief Verespe's testimony that "it was not [Plaintiff's] fault that this occurred" nor the letter of admonishment's reference to Joshua Nixon assuming "unnecessary risk" by allowing civilians in the fire pole area are binding legal conclusions. As discussed in the Motion for Summary Judgment, under New Hampshire law, Plaintiff cannot be absolved of her own choices to engage with the obvious dangers of the fire pole. *See* ECF No. 31 at 26-30. Nor does the foreseeability of injury to professional firefighters, whose job involved using the fire pole to reduce their response times, *see* Resp. at 25-27, make it foreseeable that a layperson touring the station would be injured.

Conclusion

For the above reasons, and those previously argued in its Motion for Summary Judgment, the United States asks this Court to award judgment as a matter of law under Fed. R. Civ. P. 56.

    Respectfully submitted,

    Erin Creegan
    United States Attorney

    /s/ Anna Dronzek
    Assistant U.S. Attorney
    Colorado Bar # 43912
    53 Pleasant Street, 5th Floor
    Concord, New Hampshire 03301
    (603) 225-1552
    anna.dronzek@usdoj.gov