**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**Celena Nixon**</u>

   v.

                                           Case No. 1:24-cv-213-PB-TSM
                                           Opinion No. 2026 DNH 031

<u>**United States of America**</u>

<u>**MEMORANDUM AND ORDER**</u>

Celena Nixon has sued the United States under the Federal Tort Claims Act ("FTCA") to recover for injuries she suffered at the Pease Air National Guard Base in Newington, New Hampshire. The government has moved for summary judgment on most of her claims, primarily arguing that they are barred by the FTCA's discretionary-function and misrepresentation exceptions.

**I.  BACKGROUND**

**A.  Factual Background**

The Pease Air National Guard Base is served by a dedicated fire department that operates from a fire station on base. See Doc. 22 at 4; Doc. 31-2 at 1-2. The department provides fire, rescue, and related emergency

services to the entire facility, including the military aircraft associated with the 157th Air Refueling Wing. See Doc. 31-2 at 5.[1]

The fire station that houses the fire department is a two-floor facility. See Doc. 31-6 at 1. The first floor is primarily comprised of the station's vehicle bay, along with kitchen and dining areas, some offices, and a conference room. See id. Bunk rooms, bathrooms, a gym, and a day room are located on the second floor. Doc. 31-2 at 2. A firefighter can descend from the second floor to the first floor either by taking a staircase, located near the end of the upstairs corridor, or sliding down a fire pole. See Doc. 31-6 at 1. In an emergency, firefighters use whichever route is quickest to get to the vehicle bay from their starting positions. Doc. 31-2 at 5; Doc. 31-13 at 2-4.

To access the fire pole from the second floor, a firefighter must enter the "pole room" off the upstairs corridor. Doc. 31-2 at 2-3. A door operated by a push bar separates the pole room from the corridor. Doc. 31-7 at 8. Adjacent to that door is a sign that reads "POLE" in white lettering. Id. The pole room is completely empty but for the brass pole itself, which is situated a few feet back from the door. See id. at 9. The pole emerges vertically towards the

---

[1]    See also 157th Air Refueling Wing, Pease Fire Emergency Services, https://www.157arw.ang.af.mil/Units/157th-Mission-Support-Group/157-Civil-Engineering-Squadron/157th-ARW-Fire-Emergency-Services/ [https://perma.cc/U32Q-MWHY] (last visited Mar. 31, 2026).

ceiling from a three-foot-diameter hole in the floor and is surrounded by a forty-two-inch-tall circular metal cage with spring-loaded gates which a firefighter must push open to mount the pole when closed. Doc. 31-9 at 11-12; Doc. 31-10 at 1.

From inside the cage, a firefighter using the pole descends through a forty-inch cylindrical shaft connecting the floor upstairs to the ceiling below. Doc. 31-9 at 10-11. Where the pole meets the ceiling at the bottom of the shaft, three triangular aluminum shutters come together around the pole to form a downward-pointing, cone-shaped hatch. See id.; Doc. 31-10 at 1. The hatch, which the spring-loaded shutters automatically close on hinges absent "the weight of a person sliding down the pole," Doc. 31-10 at 1, closes off the cylindrical shaft between the first and second floors. See Doc. 31-9 at 10-11. After a firefighter passes through the hatch, he or she slides to the first floor and exits through double doors into the vehicle bay. Doc. 31-7 at 1-2.

On Easter Sunday in April 2022, the fire department invited the families of its on-duty firefighters to visit the fire station for a holiday gathering. See Doc. 31-16 at 42-44. Nixon's husband was on duty that day and was joined at the station that afternoon by Nixon and their three children. Id.; Doc. 22 at 7. Soon after they arrived, Nixon's husband took the family on a tour of the station. Doc. 31-16 at 45. The tour eventually led upstairs, where Nixon's husband showed the family his bunkroom. Id. at

3

45-47. Sometime after that, Nixon's husband and their two sons left the bunk room, headed down the upstairs corridor, and entered the pole room. Id. at 47-51. Nixon and their daughter followed but found the pole room empty all three men having slid down the pole to the first floor. Id. at 50-51.

Upon entering the pole room, Nixon was struck by the pole's "timeless" "beauty[y]" and "wanted [her] picture taken." Id. at 52. After handing her phone to her daughter, she says that she walked over to the pole, where the gate into its surrounding cage was open. Id. at 54-55. In her telling, she stepped inside and placed her weight onto "another platform" (ostensibly the hatch) that "gave way." See id. at 56-58. Because she "wasn't like hanging on" as she tried to get a picture, she fell through the hatch to the ground and was injured. Id. at 58-60.

**B.    Procedural Background**

Nixon filed this lawsuit against the United States in July 2024. Doc. 1. She asserted claims for negligence and premises liability based on the fire department's failure to: "safely secure the premises for invitees" ("Theory 1"); "train invitees in the proper use" of the pole ("Theory 2"); "restrict access to the pole and the pole room" to individuals without such training ("Theory 3"); "post signs warning invitees not to approach the pole" ("Theory 4"); "post signs" warning that the floor plate "was not solid footing and would give upon placement of any weight" ("Theory 5"); "secure" the hatch "such that it did not

4

immediately allow individuals to fall through" or remove it altogether

("Theory 6"); and "install barriers to prevent" someone from "approaching the

pole" and hatch beneath ("Theory 7").[2] Doc. 22 at 10-13. Nixon demanded

damages for physical and mental suffering, medical treatment, and loss of

earning capacity. Id. at 13-14.

Following limited discovery, the government filed the instant motion

for summary judgment. Doc. 31. The government invokes two exceptions to

the FTCA's waiver of sovereign immunity, arguing that the discretionary-

function exception forecloses liability based on Theories (1), (3), (6), and (7),

and that the misrepresentation exception likewise bars relief based on

Theories (4) and (5). Doc. 31-1 at 13-25.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no genuine

dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d

206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the

"potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877

---

[2]     Nixon also asserted that the government was liable based on its
allegedly negligent installation of and failure to remove the fire pole itself.
Doc. 22 at 10, 12. In her response to the government's motion for summary
judgment, however, she disavows that theory. Doc. 36 at 10.

F.3d 14, 23 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Once the movant has properly presented such evidence, the burden shifts to the nonmovant to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in [its] favor," Irobe, 890 F.3d at 377 (alteration in original) (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the nonmovant fails to adduce such evidence on which a reasonable factfinder could base a favorable verdict, the motion must be granted. Celotex, 477 U.S. at 324. In considering the evidence, I must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

### III.  ANALYSIS

The FTCA waives the federal government's sovereign immunity and supplies a cause of action by which a plaintiff may sue the government in tort for damages arising from "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Dumais v. United States, 2023 WL 5237904, at *2, 2023 DNH 101 (D.N.H. Aug. 15, 2023) (quoting FDIC v. Meyer, 510 U.S. 471, 477 (1994)); see 28 U.S.C. §§ 1346(b), 2674. This cause of action and the Court's jurisdiction to consider such claims are subject to several exceptions, however. Torres-Estrada v. Cases, 88 F.4th 14, 21 (1st Cir. 2023) (quoting Fothergill v. United States, 566 F.3d 248, 252 (1st Cir. 2009)); see 28 U.S.C. § 2680. Where those exceptions apply, the government's immunity "bar[s] suit against it." See Perales-Muñoz v. United States, 151 F.4th 1, 6 (1st Cir. 2025).

Here, as previewed, the government invokes two of the FTCA's exceptions: the discretionary-function exception, see 28 U.S.C. § 2680(a), and the misrepresentation exception, see id. § 2680(h). For the reasons that follow, I agree that these exceptions deprive the court of jurisdiction to consider Nixon's claims save for Theory 2, on which the government did not invoke either exception.

7

## A.    <u>Discretionary-Function Exception</u>

The government argues that the discretionary-function exception deprives the court of jurisdiction over Nixon's claims to the extent that they are based on its alleged failures to: properly secure the pole room (Theory 1); restrict access to the pole and pole room (Theory 3); properly secure the hatch surrounding the pole (Theory 6); and install barriers to prevent access to the pole (Theory 7).

The discretionary-function exception "bars claims based upon the performance of 'a discretionary function or duty' of the federal government, 'whether or not the discretion involved be abused.'" Dumais, 2023 WL 5237904, at *6 (quoting 28 U.S.C. § 2680(a)). This exception serves to "insulate[] the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." Berkovitz ex rel. Berkovitz v. United States, 486 U.S. 531, 537 (1988).

To determine whether the discretionary-function exception applies, I undertake a two-step inquiry. Davallou v. United States, 998 F.3d 502, 504-05 (1st Cir. 2021) . First, I "identify the conduct that allegedly caused the harm." Id. (quoting Shansky v. United States, 164 F.3d 688, 690-91 (1st Cir. 1999)). Second, I assess whether the conduct "is of the nature and quality that Congress, in crafting the discretionary function exception, sought to shelter from tort liability." Shansky, 164 F.3d at 691. This latter inquiry

distills to two elements, both of which must be satisfied for the exception to apply: first, that the conduct is "discretionary," and second, that it is "susceptible to policy analysis." Thiersaint v. DHS, 85 F.4th 653, 659 (1st Cir. 2023) (quoting Davallou, 998 F.3d at 505).

Here, for purposes of the discretionary-function test, the government accepts Nixon's description of the conduct on which Theories (1), (3), (6), and (7) are based, their common thread being the fire department's purported failure to take steps to physically impede visitors' potential use of the fire pole. I thus proceed to examine whether those four theories of liability nevertheless fail because those alleged shortcomings are discretionary and subject to policy analysis. See id.

1.    Discretionary Nature of Conduct

Where "a federal statute, regulation, or policy dictates a course of action," conduct obligated by or violative of that authority is not discretionary. Perales-Muñoz, 151 F.4th at 7 (citation modified). Likewise, unconstitutional acts are not shielded by the discretionary-function exception, as "[f]ederal officials do not possess discretion to violate constitutional rights." Torres-Estrada, 88 F.4th at 21 (alteration in original) (quoting Thames Shipyard & Repair Co. v. United States, 350 F.3d 247, 255 (1st Cir. 2003)). But a plaintiff cannot merely identify an authority that "contains mandatory directives" to show that governmental conduct was

9

non-discretionary; the plaintiff must base his or her claims on directives that are "'directly applicable' to the challenged conduct." Sánchez ex rel. D.R.-S. v. United States, 671 F.3d 86, 97 (1st Cir. 2012) (quoting Muniz-Rivera v. United States, 326 F.3d 8, 16 (1st Cir. 2003)). Significantly, a government official's "unsubstantiated recollection of an unidentified policy statement" or "testimony that purports to describe written policies and regulations" alone cannot establish a mandatory directive. Id. at 98 (quoting Shansky, 164 F.3d at 692). Likewise, a "broadly worded expression of a general policy goal" is insufficient. Shansky, 164 F.3d at 691.

Nixon identifies what she claims are three non-discretionary duties of the fire department that support Theories (1), (3), (6), and (7). She first argues that the department's policies on guests, Doc. 35-12, and tours, Doc. 35-13, required the department to limit access to the fire station in ways that would have prevented Nixon from being injured. In relevant part, the guest policy states that guests "are not allowed on the second floor" but has an exception for tours "as outlined in the Station Tours policy." Doc. 35-12 at 1. The tours policy, meanwhile, allows tours to visit the second floor, only requiring a public announcement of "Fire Watch" when there are guests in the station and an announcement of "Fire Watch 2nd Floor" when a tour is permitted to access the second floor. Doc. 35-13 at 1. Neither policy barred Nixon's husband from taking his family on a tour of the station's second floor,

10

and Nixon does not connect her injuries in any way to any failure by the department to announce a "fire watch" when he did so. Thus, even if these policies were otherwise non-discretionary, they are not "directly applicable" to the conduct on which her claims are based.[3] See Sánchez ex rel. D.R.-S., 671 F.3d at 97 (quoting Muniz-Rivera, 326 F.3d at 16).

Nixon next argues that National Fire Protection Association Standard 1500 ("NFPA 1500"), Doc. 31-26, Air Force Occupational Safety, Fire and Health Standards ("AF Safety Standards"), Doc. 31-20, and 29 C.F.R. § 1910.29, which the AF Safety Standards adopt by reference, required the fire department to secure the hatch surrounding the fire pole "such that it supported the weight of a person who might accidentally step on it." Doc. 36 at 12. In relevant part, section 10.1.8 of the NFPA 1500 directs that:

> Stations utilizing poles to provide rapid access to lower floors shall ensure that the area around the pole hole is secured by means of a cover, enclosure, or other means to prevent someone from accidentally falling though the pole hole.

---

[3]     Nixon also suggests that the fire department has a policy, violated in her case, of prohibiting guests from using the fire pole. She does not identify any written policy to that effect, however—only the deputy chief's testimony that he would "never allow anybody" to use the pole. Doc. 35-21 at 6. To the extent this statement pertains to a formal directive, its mere "recollection of an unidentified policy" is insufficient to establish a mandatory duty for the purpose of discretionary-function analysis. Sánchez ex rel. D.R.-S., 671 F.3d at 98 (quoting Shansky, 164 F.3d at 692).

11

Doc. 31-26 at 3. Section 7.1.4.2 of the AF Safety Standards requires that:

> A cover shall be used for less frequently used openings where traffic across the opening prevents the use of fixed railings, such as openings located in aisle spaces. In addition, covers or guards shall be used to protect people from the hazards of open pits, tanks, vats, ditches, etc. Refer to 29 CFR 1910.29, <u>Fall Protection Systems and Falling Objection Protection-Criteria and Practices</u>, for additional requirements.

Doc. 31-20 at 41 (internal citations omitted). And 29 C.F.R. § 1910.29 requires that an employer "must ensure" that a "cover for a hole in a walking-working surface" can sustain "twice the maximum intended load" to be imposed on it and "is secured to prevent accidental displacement." 29 C.F.R. § 1910.29(e).

None of the policies that Nixon cites impose a non-discretionary duty on the fire department to secure the hole surrounding the fire pole with a cover, let alone a cover that can support a person's weight. NFPA 1500, which is the standard that most clearly applies here, gives the department the discretion to choose whether to use "a cover, enclosure, <u>or</u> other means" to prevent accidental falls through the hole. Doc. 31-26 at 3 (emphasis added). Phrased disjunctively, this provision does not require the department to use a cover if it uses an enclosure, which is what it did in this case. The AF Safety Standards in most cases likewise give the government similar discretion to protect people from the hazards of falling into "open pits, tanks, vats, ditches,

12

etc." by using either "covers or guards." Doc. 31-20 at 41 (emphasis added). Covers are only required "for less frequently used openings where traffic across the opening prevents the use of fixed railings," which the cage surrounding the hole already prevents. Id.; see Doc. 31-7 at 9. Finally, subsection 1910.29(e) does not require the use of a cover; rather, it sets forth two criteria that a cover must meet, if used. 29 C.F.R. § 1910.29(e). In fact, the preceding section of that regulation makes clear that, as under NFPA 1500, a cover is one of several means of preventing falls among which an employer is free to choose. See 29 C.F.R. § 1910.28(b)(3)(i) ("The employer must ensure" that "[e]ach employee is protected from falling through any hole . . . by one or more of the following: (A) Covers; (B) Guardrail systems; (C) Travel restraint systems; or (D) Personal fall arrest systems."). All in all, because none of these policies required the department to secure the hole with a cover rather than a cage around the hole, its choice of one method over the other was discretionary.

Nixon's third argument fares no better. Here again, she invokes NFPA 1500, this time arguing that it imposed a non-discretionary duty on the department to ensure that the enclosure surrounding the pole hole would "prevent accidental falls." Doc. 36 at 13-14. She then points to evidence suggesting that the gate to the cage was often left open, and may have been

open when she entered the pole room, to support her contention that the department failed to comply with this non-discretionary duty. Id.

Even assuming dubitante that this formulation of the department's duty and conduct were cogent, Nixon's claims related to the cage fail as a matter of law on the undisputed facts. Nixon admits that, to get a picture of herself holding the pole, she stepped inside the cage, meaning that she necessarily bypassed its gate, whether it was open or closed. See Doc. 31-16 at 56 ("Q: And so then to be clear, you entered the circle that was around the pole to [take a picture]? A: Yes."). Thus, even if the department indeed defied a non-discretionary duty to secure the cage so that it would prevent an accidental fall, Nixon severed any causal link between that negligent conduct and her fall by intentionally entering the cage anyway. Because the cage therefore played no causative role in Nixon's accident, her attempt to ground the Court's jurisdiction on a mandatory duty to ensure that the cage prevents accidental falls fails because any such duty is not "directly applicable" to the challenged conduct. See Sánchez ex rel. D.R.-S., 671 F.3d at 97 (quoting Muniz-Rivera, 326 F.3d at 16).

In sum, Nixon has not identified any non-discretionary duty applicable to the department's conduct relevant to Theories (1), (3), (6), and (7). I thus proceed to examine whether that conduct is subject to policy judgments. See Thiersaint, 85 F.4th at 659.

14

### 2.    Susceptibility to Policy Analysis

Determining whether a discretionary decision is "susceptible to policy-related judgments" requires a "case-by-case approach." Shansky, 164 F.3d at 692. Generally, if the decision is one "about which reasonable persons can differ" and "informed by a need to balance concerns about a myriad of factors," it implicates policy judgments. Fothergill, 566 F.3d at 253. This is an objective inquiry; the government's subjective intent, including "whether government actors decided the point explicitly or actually discussed it," is beside the point. Shansky, 164 F.3d at 692. Instead, we only consider "whether some plausible policy justification could have undergirded the challenged conduct." Id. And, critically for this case, the First Circuit has specifically disavowed any "generalized 'safety exception'" from this deferential, objective inquiry. Id. at 693.

Analogizing to the First Circuit's decision in Ayer v. United States, the government contends that the policy judgments about how a fire pole should be secured implicates a trade-off between safety and speed. See 902 F.2d 1038 (1st Cir. 1990). In Ayer, the plaintiff fell off the suspended floor of an underground missile-launch control center at an Air Force base while on a tour of facilities "not ordinarily accessible to non-military personnel." Id. at 1039. The plaintiff evidently fell because there was "no railing or other protective device" preventing someone from taking such a tumble. Id. The

15

lack of a physical impediment was no accident; the base commander had "made an affirmative decision" not to modify the control center's walkways in the interest of physical safety, in part because doing so would "jeopardize the launch site by confining the free motion of the floor." Id. at 1040. Affirming the district court's application of the discretionary-function exception, the First Circuit noted that the government's decision required it to balance important mission-related priorities—including "the survivability of missile launch facilities" upon attack—with visitor safety. See id. at 1043-44. Because the government's countervailing considerations were not "pretextual," the First Circuit concluded that the government's judgment that those considerations outweighed visitor safety was an "exercise of policy-based discretion" which courts are "precluded from second-guessing." Id. at 1044.

The government asserts that a similar trade-off is at play in this case, and I agree. Just as in Ayer, the extent to which the fire department structurally impedes access to the fire pole directly affects both the department's performance of a core function (quickly deploying in response to emergencies on base) as well as the safety of visitors to the fire station. While electing not to take steps to physically encumber access to the pole potentially hastens firefighters' response to calls, it also elevates the risk that a visitor touring the station's second floor—a non-public area, like the control

16

center in Ayer, see id. at 1039; Doc. 35-12 at 1—avails herself of the pole with similar ease. Without a binding directive on point, the importance of speed to a firefighter's response, see Doc. 31-2 at 5, certainly supplies a "plausible policy justification" for sacrificing additional precautionary measures for the benefit of mission-adjacent civilian visitors. See Shansky, 164 F.3d at 692.

Arguing to the contrary, Nixon points to three out-of-circuit cases in which courts declined to apply the discretionary-function exception. All three are inapposite. In Gotha v. United States, the competing policy considerations were described by the Navy at such a high level of generality that they "conceivably could [have] go[ne] to any decision" that the Navy makes. See 115 F.3d 176, 181 (3d Cir. 1997). Here, in contrast, a firefighter's speed of response is uniquely implicated by the extent of physical encumbrances impeding expedient egress from the fire station. In Chang v. United States, the government's action amounted to its negligent "implementation of an established governmental policy decision already made" that occurred downstream of a preceding discretionary decision. See 139 F.4th 1087, 1097 (9th Cir. 2025). This case is different because Nixon challenges the fire department's initial decision not to further obstruct the fire pole, not its performance of routine maintenance related to the fire pole or its obstructions. And in Andrulonis v. United States, the court rested its decision on the conclusion that a government official's discretionary acts were

17

unrelated to the purpose of the regulatory regime affording the official discretion. See 952 F.2d 652, 655 (2d Cir. 1991). In this case, the department's decision not to obstruct access to the pole directly serves its interest in a fast response.

* * *

To summarize, to the extent that Nixon's undisputed actions leave it at issue, the fire department's conduct implicated by Theories (1), (3), (6), and (7) is generally discretionary and susceptible to policy analysis. The discretionary-function exception therefore applies, see Davallou, 998 F.3d at 504-05, and the government is entitled to summary judgment on those theories of relief.

## B.    Misrepresentation Exception

Two of Nixon's remaining theories concern the fire department's purported failure to warn of the fire pole's inherent hazards. Under these theories, she alleges that the government is liable for "failing to post signs warning invitees not to approach the pole" (Theory 4) and for "failing to post signs that the floor by the pole was not solid footing and would give upon placement of any weight" (Theory 5). Doc. 22 at 11-12. The government responds that I lack jurisdiction to hear these failure-to-warn claims under the FTCA's misrepresentation exception.

18

The misrepresentation exception provides that "neither the FTCA's substantive cause of action nor its waiver of immunity applies to claims 'arising out of . . . misrepresentation.'" Dumais, 2023 WL 5237904, at *5 (quoting 28 U.S.C. § 2680(h)). As interpreted in the FTCA context, the term "misrepresentation" is something of a misnomer, as it covers claims based on "a wide range of communicative activity," not just those alleging deceit. See Muniz-Rivera, 326 F.3d at 13. As relevant here, the exception also "precludes the assertion of a cause of action against the government based upon either miscommunication or non-communication of . . . information," including its "'failure to give any warning to injured parties.'" Id. (quoting Green v. United States, 629 F.2d 581, 584 (9th Cir. 1980)). And unlike other exceptions listed in subsection 2680(h), the misrepresentation exception is agnostic to scienter, applying equally to negligent and deliberate miscommunications by a government official. See id. (citing United States v. Neustadt, 366 U.S. 696, 702 (1961)). Still, there are limits: where an action is premised "not on the Government's failure to use due care in communicating information, but rather on the Government's breach of a different duty," the exception does not apply. Block v. Neal, 460 U.S. 289, 297 (1983).

Nixon's failure-to-warn claims assert that the government was negligent in failing to discourage use of the fire pole or communicate the dangers it posed. Either theory self-evidently turns on the government's

19

non-communication of a warning (and Nixon's reliance on that silence), placing them squarely within the ambit of the misrepresentation exception. See Muniz-Rivera, 326 F.3d at 13.

Nixon relies on Block in response, arguing that the government's duty to post warnings pertaining to the fire pole derives from its "independent duty to keep its premises safe" under New Hampshire law. Doc. 36 at 18. So her argument goes, the communicative (or non-communicative) nature of the government's alleged conduct here is thus irrelevant, as warnings would simply have been one of "multiple ways to fulfill its premises safety duty." Id.

Binding precedent forecloses Nixon's argument. In Muniz-Rivera, the plaintiffs asserted a mix of FTCA claims against the government, including both failure-to-warn claims and claims based on alternative theories. Muniz-Rivera, 326 F.3d at 12-13. In applying the misrepresentation exception to the failure-to-warn claims, the First Circuit recognized that the exception applied generally to such claims where the plaintiff's theory of liability turns on the government's "failure to communicate precautionary information." Id. at 13-14. Acknowledging Block, the court noted that the exception did not apply to the plaintiffs' remaining claims based on alternative theories because those theories implicated breaches of the government's duty that did not involve communicating information. Id. at 14. But the court ultimately

20

rejected those claims as well, based instead on the discretionary-function exception. Id. at 14-17.

So too, here. Because Nixon's failure-to-warn claims are inextricably reliant on the fire department's alleged failure to communicate information, they are subject to the misrepresentation exception. And, because her remaining claims are barred by the discretionary-function exception, I lack jurisdiction over those claims as well.

## C.     **Failure to Train**

Nixon asserts that the government is liable in part because it failed to "train invitees in the proper use" of the fire pole (Theory 2). Doc. 22 at 11-12. Although it is likely that any claims based on this theory are also barred by the discretion-function exception, I do not presume as much, as the government has not challenged this theory of liability in its motion for summary judgment. And as applied to this theory, the government's alternative arguments concerning the scope of the fire department's duties, the foreseeability of danger posed by the fire pole, and Nixon's comparative fault present triable disputes of material fact. I therefore deny the government's motion for summary judgment as to Theory 2 without prejudice to any motion addressing this Court's jurisdiction over those claims.

21

## IV.  <u>CONCLUSION</u>

For the reasons explained, I grant in part and deny in part the government's motion for summary judgment. Doc. 31. All that remains to resolve in this case are Nixon's failure-to-train claims under Theory 2.

SO ORDERED.

<u>/s/ Paul J. Barbadoro</u>
Paul J. Barbadoro
United States District Judge

March 31, 2026

cc:   Counsel of Record